IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br><br>         vs.<br><br><br>SAUL GARCIA MACIAS and<br>JACQUELINE KAY FODNESS<br><br>    Defendants. | **REPORT AND RECOMMENDATION**<br><br><br><br>Case No. 2:06-CR-111 DAK |

Before the court are Motions to Suppress submitted by
Defendants Saul Garcia Macias and Jacqueline Kay Fodness.
(Documents #25, 29.)  Defendants seek to have suppressed evidence
seized on February 2, 2006, (1) during a search of Defendant
Macias's vehicle and (2) during a search of a residence in Sioux
Falls, South Dakota.  After thorough review and consideration of
the testimony and evidence presented at the evidentiary hearing,
the parties' pleadings, and the subsequent oral arguments, the
court recommends that Defendants' Motions to Suppress be denied.

### FACTUAL BACKGROUND

On the morning of February 2, 2006, Utah Highway Patrol
(hereafter referred to as "UHP") Officer Nick Bowles was in his
patrol vehicle.  (Document #40, Official Transcript of
Evidentiary Hearing on Motion to Suppress, held July 13, 2006

(hereafter referred to as "Tr. at __"), at 11.)  Officer Bowles has been with the UHP for approximately six years.  (Tr. at 8.)  Officer Bowles is Peace Officer Standards and Training certified and has specific training in narcotics interdiction through the three-day "Desert Snow" course, as well as numerous other in-service training courses.  (Tr. at 9.)  Officer Bowles is a member of the UHP's criminal interdiction team.  (Tr. at 9.)  By his estimation, Officer Bowles has conducted roughly 9,000 traffic stops during his career, of which "probably close to 500" involved narcotics.  (Tr. at 9-10.)  Of those approximately 500 stops, Officer Bowles testified that approximately thirty-five stops involved distribution quantities of narcotics, which Officer Bowles defined as anything over four ounces.  (Tr. at 10.)  Officer Bowles testified that, according to his training and experience, California is a major source for narcotics being transported eastward, and that I-70 is a major drug corridor. (Tr. at 35-36, 66-67.)

At approximately 9:00 a.m. on February 2, 2006, Officer Bowles' patrol vehicle was facing east in the median of I-70, near milepost two, just east of the interchange with I-15.  (Tr. at 11.)  At that time, he saw a black Chevy S-10 pickup traveling east that did not appear to have license plates.  (Tr. at 11.)  Officer Bowles followed the pickup to investigate, and upon reaching a distance of approximately 100 feet from the pickup, noticed that the pickup actually had a temporary permit in the

rear window.  (Tr. at 11, 53.)  However, at that time, Officer

Bowles noticed that the pickup had caught up to another vehicle

and was following the other vehicle at a distance of only about

one car length, or "10 to 15 feet," which Officer Bowles

testified is an unsafe distance and is a violation of Utah law.

(Tr. at 11-12.)  Officer Bowles activated his lights and

initiated a traffic stop of the pickup.  (Tr. at 12.)  Officer

Bowles testified that his in-vehicle camera also activates when

his lights are turned on, although sometimes with up to a five to

six second delay.  (Tr. at 12.)[1]

Officer Bowles approached the pickup on the passenger side

and observed a "very strong chemical odor" coming from the

pickup.  (Tr. at 15-16.)  Officer Bowles testified that the odor

was apparent before he reached the passenger window, but became

even stronger when he reached it.  (Tr. at 15-16.)  Officer

Bowles also noticed two small gym bags, which appeared to be

---

[1]Officer Bowles testified that when he initiated the traffic
stop, his camera appeared to be working correctly because it
beeped when he turned on his lights.  (Tr. at 13.)  However, in
actuality, the audio of the recording is scratchy and frequently
cuts out.  (Tr. at 13; Government's Exhibit 1, Videotape of Stop
(hereafter referred to as "Ex. 1").)  In addition, the video
stops after approximately two minutes.  (Tr. at 13; Ex. 1.)
    Officer Bowles testified that he had not tested the
recording equipment that day, but that it had worked the previous
day.  (Tr. at 54.)  Officer Bowles testified that he has had that
particular equipment malfunction before this stop occurred
several times, and had made requests to have the equipment fixed.
(Tr. at 14.)  He had taken the equipment to be fixed twice
before, but continued to have problems with it.  (Tr. at 14.)
After Defendants were arrested, Officer Bowles had the equipment
replaced.  (Tr. at 14.)

about two feet long by one foot wide and not very full, and numerous plastic shopping bags in the rear of the pickup's cab. (Tr. at 15.)  Officer Bowles suspected, based upon his training and experience, that the odor may indicate the presence of an after-market compartment in the pickup, because "Bondo" or glue is often used to secure or seal such compartments.  (Tr. at 16.)

Two people were in the pickup:  the driver, Defendant Macias, and the passenger, Defendant Fodness.  (Tr. at 16-17.) Officer Bowles asked for Defendant Macias's license and vehicle information.  Defendant Macias provided him with a Mexican identification card and a purchase agreement for the pickup. (Tr. at 17.)  The ID card appeared to be valid to Officer Bowles, and at the evidentiary hearing before the court, Officer Bowles testified that it appeared to be a Mexican driver's license. (Tr. at 17-19; Government's Exhibit 2 (hereafter referred to as "Ex. 2").)  The purchase agreement also appeared to be valid and was in Defendant Macias's name.  (Tr. at 17-18; Government Exhibit 3 (hereafter referred to as "Ex. 3").)  The temporary license tag also appeared to be valid to Officer Bowles.  (Tr. at 21.)  While gathering this information from Defendant Macias, Officer Bowles noticed that Defendant Fodness would not look at him, but she "just stared straight forward," indicating to the officer that Defendant Fodness was nervous.  (Tr. at 24.)

Officer Bowles asked Defendant Macias to accompany him back to his patrol car.  Defendant Macias agreed.[2]  (Tr. at 22.)  When Defendant Macias entered the patrol car, Officer Bowles explained to him the reason for the stop, informed Defendant Macias that he would issue him a warning, and began filling out the warning.  (Tr. at 22.)  Officer Bowles testified that he and Defendant Macias communicated in English; Officer Bowles asked questions in English and Defendant Macias responded in English.  (Tr. at 22-23.)  Officer Bowles testified that Defendant Macias appeared to be nervous and that he avoided looking at Officer Bowles.  (Tr. at 23.)  Officer Bowles testified that Defendant Macias appeared to be more nervous than the majority of people he stops for traffic violations, and that his nervousness did not abate over time, but if anything, it increased.  (Tr. at 24.)  Officer Bowles testified that this increase in nervousness over time is "unusual" and indicates to him possible criminal activity (Tr. at 24), although Officer Bowles admitted that he has pulled over other people who were not involved in drug trafficking who acted more nervous than did Defendant Macias (Tr. at 65).

While he was verifying Defendant Macias' information and filling out the warning, Officer Bowles started a conversation with Defendant Macias.  (Tr. at 25.)  Officer Bowles testified

---

[2]Soon after Officer Bowles enters his patrol car, but before Defendant Macias walks back to the patrol car, the recording equipment cuts out altogether, and there is no further recording on the video submitted by the Government.  (Tr. at 56-57; Ex. 1.)

that he starts conversations with people during traffic stops in order to help calm the person stopped, but also to gauge how honest people are being with him.  (Tr. at 27.)  Officer Bowles and Defendant Macias talked about the defendants' travel and about their association.  (Tr. at 25.)  Defendant Macias said the passenger was his girlfriend, Jacqueline.  (Tr. at 25.)  Officer Bowles asked Defendant Macias for Jacqueline's last name. Defendant Macias paused and then replied that he did not know her last name.  (Tr. at 25.)  Officer Bowles testified that he found this answer unusual and an indicator that Defendant Macias was being deceptive.  Officer Bowles testified that, based upon his training and experience, deceitful behavior is an indicator of criminal activity.  (Tr. at 25-26.)  Defendant Macias told Officer Bowles that he and Jacqueline had been dating for six months.  (Tr. at 26.)

Officer Bowles and Defendant Macias also talked about the defendants' travel while they waited for dispatch to check Defendant Macias's information.  (Tr. at 26.)  Defendant Macias told Officer Bowles that they had been visiting *his family* in California for about one week.  (Tr. at 26.)  Officer Bowles asked Defendant Macias what he did for a living, and he responded that he worked at a restaurant and did construction work.  (Tr. at 28.)  However, when Officer Bowles asked him for the names of the restaurant and construction company, Defendant Macias responded that he actually was unemployed and had been for two

months.  (Tr. at 28.)  Officer Bowles testified that, in his experience with narcotics interdiction, those involved will claim legitimate employment when there is none.  (Tr. at 28-29.) Officer Bowles also asked about Defendant Fodness's employment; Defendant Macias replied that he had never known her to have a job.  (Tr. at 29.)  Officer Bowles found it strange that two unemployed people would be on a week-long vacation.  (Tr. at 29.)

Dispatch then informed Officer Bowles that a valid license could not be found for Defendant Macias, but that he did not have any outstanding warrants.  (Tr. at 29.)  Officer Bowles handed Defendant Macias the warning, told him he was free to go, and turned off the patrol car's front-facing lights.  (Tr. at 29.) Defendant Macias then confirmed with Officer Bowles that he was free to leave, exited the patrol car, and returned to the pickup. (Tr. at 30.)  Officer Bowles testified that although he told Defendant Macias that he was free to leave, Officer Bowles actually intended to continue to detain Defendants, and therefore Defendant Macias actually was not free to leave.  (Tr. at 62.)

When Defendant Macias reached his pickup, Officer Bowles exited his car and asked if he could speak again with him, to which Defendant Macias agreed, and the two men met in between the pickup and the patrol car.  (Tr. at 30.)  Officer Bowles asked Defendant Macias when exactly Defendants had left for their vacation, and Defendant Macias could not remember the exact day.

7

(Tr. at 30.)  Officer Bowles thought this inability to remember
when they left for their vacation was unusual.  (Tr. at 30.)

After asking Defendant Macias permission, Officer Bowles
then approached Defendant Fodness and asked her about their
travel.  (Tr. at 31.)  Defendant Fodness told Officer Bowles that
they had been in California for a week visiting *her* family and
visiting Disneyland.  (Tr. at 31.)  Neither defendant indicated
that they had separated during the trip, so Officer Bowles
noticed the travel stories were conflicting.  (Tr. at 31.)
Defendant Fodness indicated they had been in California for a
week, but then said they had stayed one night at a friend's house
- which she later corrected to be her aunt - and one night at an
Econolodge, totaling only two nights.  (Tr. at 32-33.)  Officer
Bowles testified that when suspects' stories don't "add up," it
is often because they are engaging in illegal activity and have
concocted a travel story.  (Tr. at 33.)  Officer Bowles noticed
that Defendant Fodness's carotid artery was pulsating rapidly in
her neck as they spoke, something he "very rarely sees" and
indicated to him "extreme nervousness."  (Tr. at 33-34.)  In
addition, when he has seen that indicator in traffic stops, he
has "often" found narcotics.  (Tr. at 34.)  Defendant Fodness
confirmed that she was unemployed.  (Tr. at 34.)

Officer Bowles returned to talk with Defendant Macias and
again confirmed some of Defendants' travel plans.  (Tr. at 34-
35.)  Officer Bowles told Defendant Macias that some things

concerned him.  (Tr. at 34.)  Officer Bowles then asked Defendant
Macias if they were doing anything illegal, and Defendant Macias
said they were not.  (Tr. at 34.)  Officer Bowles asked Defendant
Macias if there were any drugs in the pickup; specifically,
Officer Bowles asked if the pickup contained any marijuana,
cocaine, methamphetamine, or heroin.  (Tr. at 34, 36.)  Defendant
Macias looked away from Officer Bowles and quietly responded "no"
when asked about each drug.  (Tr. at 36.)  Officer Bowles then
asked Defendant Macias, "Can I search the vehicle?"  (Tr. at 36-
37.)  Defendant Macias responded, "Okay."  (Tr. at 37.)  Officer
Bowles then asked Defendant Fodness the same series of questions
about the presence of drugs in the pickup, and then asked for her
permission to search the pickup.  (Tr. at 37.)  Defendant Fodness
responded that there were no drugs in the pickup and, to Officer
Bowles' recollection, stated "something to the effect that she
didn't see any reason" for him to search, but to go ahead.[3]  (Tr.
at 37.)  To the best of Officer Bowles's recollection, Defendant
Fodness told him he could search the pickup.

Officer Bowles asked Defendants to stand twenty feet in
front of the pickup on the side of the road.  (Tr. at 39.)
Officer Bowles began the search with the bags in the pickup,

---

[3]Officer Bowles testified at the evidentiary hearing
regarding Defendant Fodness's words:  "She said something to the
effect that 'I don't see any reason for you to search,' – my best
recollection – 'but go ahead.  But if you feel like it, if you
feel you need to.'"  (Tr. at 38.)

finding nothing suspicious.  (Tr. at 40.)  He also searched a
jacket that Defendant Fodness had requested, finding a ticket
stub for a Frontier Airlines flight from Omaha to Denver dated
January 31, and then gave her the jacket.  (Tr. at 40-41; Ex. 6.)
Officer Bowles then began searching the passenger side of the
pickup's cab, suspecting a hidden compartment, but finding
nothing suspicious.  (Tr. at 43-44.)  He then moved to the
driver's side of the cab, and immediately noticed a cut in the
carpet running from the door to the center console.  (Tr. at 44.)
Officer Bowles testified he believed he had found the hidden
compartment because a cut in the carpet is uncommon and the
passenger side did not have such a cut.  (Tr. at 44.)  Officer
Bowles did not ask Defendant Macias about the cut in the carpet,
and he did not ask permission to remove the carpet or molding.
(Tr. at 68.)  He removed the molding and pulled the carpet up
"just a little ways," observing a one-quarter-inch-thick steel
plate, which appeared to have "Bondo" sealant around it and
screws holding it down.  (Tr. at 44-45.)  Officer Bowles noticed
that the chemical odor he had smelled coming from the pickup was
"very strong" at this point, and believed that it was coming from
the carpet glue.  (Tr. at 45.)  Officer Bowles then examined the
underside of the truck at the driver's side of the cab, and saw
that it dipped down two to three inches, although the floor of
the interior was level, indicating a two to three inch gap.
Officer Bowles confirmed this gap with a "finger test," by

putting one finger on the floor of the cab and one on the undercarriage to test the difference between the two.  (Tr. at 45.)  In a vehicle without a secret compartment, Officer Bowles had felt a one-quarter-inch to one-half-inch gap when performing such tests.  (Tr. at 46.)

Officer Bowles testified he felt obligated to access the compartment because every such compartment he had found in the past had contained narcotics.  (Tr. at 46-47.)  Officer Bowles did not ask permission to unscrew the screws or to remove the steel plate.  (Tr. at 68.)  Officer Bowles unscrewed the screws holding the plate and, unable to do so with his bare hands, used a crowbar to pry the plate up enough to see into the compartment. (Tr. at 47.)  Inside the compartment, Officer Bowles saw a package that appeared to be wrapped in green cellophane, similar in appearance to other packages he had seen that contained narcotics.  (Tr. at 47.)  He placed both defendants under arrest, requested assistance, and eventually took Defendants and the truck back to the Millard County Sheriff's Office.  (Tr. at 47.) The officers determined that the secret compartment was opened by turning the defrost on, the fan to "high," and applying pressure to the lid.  (Tr. at 48.)  Inside the compartment were eight packages containing a total of six pounds of a substance, which field-tested positive for methamphetamine.  (Tr. at 48-49.)

Defendants were arrested and each was charged with one count of possession with intent to distribute methamphetamine and

aiding and abetting.[4]  (Document #1.)  Following Defendants'
arrest, a search warrant was issued by a magistrate and executed
on Defendant Fodness's residence, an apartment located at 324
South Chicago in Sioux Falls, South Dakota.  (Document #37,
Attachments #1 (hereafter referred to as "Warrant") and 2
(hereafter referred to as "Affidavit").)

### PROCEDURAL HISTORY

Both Defendants were indicted on March 1, 2006.  (Document
#1.)  The case was assigned to United States District Judge Dale
A. Kimball, who referred the case to United States Magistrate
Judge Samuel Alba, pursuant to 28 U.S.C. § 636(b)(1)(B), on June
27, 2006.  (Documents #1, 30.)

On May 25, 2006, Defendant Macias filed his Motion to
Suppress. (Document #25.)  On May 26, 2006 Defendant Fodness
filed her Motion to Suppress, which was soon followed by her
Amended Motion to Suppress on June 1, 2005.  (Document #28, 29.)
An evidentiary hearing on the motion was held on July 13, 2005.
(Documents #32, 33, 40.)

Defendant Fodness filed a memorandum in support of her
Motion to Suppress on August 18, 2006, and August 28, 2006.
(Documents #37, 38.)  Defendant Macias filed a memorandum in
support of his Motion to Suppress on August 28, 2006.  (Document

---

[4]Defendant Macias also was charged with one count of
possession of a false immigration document and aggravated
identity theft.  (Document #1.)

#39.)  The Government filed its Response to Defendant Fodness's
memorandum on September 6, 2006, and its Response to Defendant
Macias's memorandum on September 15, 2006.  (Documents #41,43.)
On September 18, 2006, Defendant Fodness filed a memorandum
joining in the memorandum filed by Defendant Macias.  (Document
#44.)

On October 19, 2006, the court held oral arguments (File
Entry #48) and thereupon took the matter under advisement.

**ANALYSIS**

First, both Defendants seek to have suppressed any evidence
seized during the September 2, 2005 traffic stop.  Defendants
argue that Officer Bowles violated Defendants' Fourth Amendment
rights by conducting both an illegal stop and an illegal search
of the pickup.

Second, Defendant Fodness argues the evidence obtained from
the search of the South Dakota residence should be suppressed
because the search warrant was invalid for lack of probable
cause, and further, was so lacking in probable cause that no
reasonable officer would rely upon it, and therefore, the *Leon*
good faith exception does not apply.  The court addresses each of
these arguments in turn.

**I.  The Stop and Search of the Pickup**

The court first addresses Defendants' argument that the
evidence obtained during the stop and search of the pickup should
be suppressed because the stop and search were illegal.

13

Specifically, Defendant argues that Officer Bowles: (1) conducted a stop without reasonable suspicion, (2) exceeded the scope of the stop, (3) conducted a search without valid consent, (4) exceeded the scope of consent to search, and/or (5) conducted a search without probable cause.  The court only addresses Defendants' first four arguments because it rejects each of them and therefore need not examine whether Officer Bowles had probable cause to search the pickup.

## A.  The Initial Stop

The court first addresses Defendants' argument that Officer Bowles conducted a stop without reasonable suspicion because he pulled over the pickup without a reasonable articulable suspicion that a violation had occurred.

"[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."  *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995), *cert. denied*, 518 U.S. 1007 (1996).  "To determine the initial validity of a traffic stop, we ask whether the stop was 'objectively justified.'"  *United States v. DeGasso*, 369 F.3d 1139, 1143 (10th Cir. 2004) (citation omitted).

In this case, Officer Bowles testified that when he caught up to Defendants' car, he immediately noticed that Defendants' car was following too closely to the vehicle in front of it.

14

According to Utah law, "The operator of a vehicle: (a) may not follow another vehicle more closely than is reasonable and prudent, having regard for (i) the speed of the vehicles; (ii) traffic upon the highway; and (b) shall allow sufficient space in front of the vehicle to enable any other vehicle to enter and occupy the space."  Utah Code Ann. § 41-6a-711(1).[5]  Officer Bowles testified that he observed Defendants' pickup following ten to fifteen feet behind the vehicle in front of it, which he testified "seemed very unsafe" and which he determined to be a violation of the Utah Code.  (Tr. at 12.)  Officer Bowles testified that such a distance does not allow the rear vehicle time to stop should the front vehicle come to a sudden stop. (Tr. at 12.)

Defendants argue that this statute leaves to the police officer's discretion what speed is "reasonable and prudent."  The court agrees.  The statute obviously allows officers to determine what distance is "reasonable and prudent" given the speed and conditions.  Defendants have not demonstrated to the court that

---

[5]There are two exceptions to Section 41-6a-711(1)(b) regarding how closely a vehicle may follow another vehicle. Those exceptions are (1) funeral processions and (2) "congested traffic conditions resulting in prevailing vehicle speeds of less than 35 miles per hour."  Utah Code Ann. § 41-6a-711(2).  Neither of those exceptions applies in this case.

such officer discretion is inappropriate or not acceptable under the law.[6]

Defendants argue that their pickup following too closely to the vehicle in front of it was caused by Officer Bowles cutting off Defendants' ability to pass the vehicle in front of it. However, this argument is based on speculation, and nothing in the evidentiary hearing supports it.  In addition, even if Defendants' argument were true and Defendants consider that the conduct was subjectively justified, the evidence still supports that Utah law was violated.  Because Officer Bowles observed a violation of Utah law, Officer Bowles had reasonable articulable suspicion that a traffic violation was occurring, and the stop was justified at its inception.  *See Botero-Ospina*, 71 F.3d at 787.

## B.  Scope of the Stop

Defendants also argue that Officer Bowles exceeded the scope of the stop.

---

[6]The court notes that the Government points out in its memorandum that the Utah Driver's License Manual provides the following guidance regarding what is reasonable and prudent when following another vehicle:  "You should always remain at least three seconds in following distance behind the vehicle ahead of you."  *Id.* at 39.  Certainly, at freeway speeds, ten to fifteen feet would not be three seconds in following distance.  The court also notes that, when going freeway speeds, ten to fifteen feet is probably insufficient to enable another vehicle "to enter and occupy the space," as required by Utah Code Annotated § 41-6a-711(1)(b).

16

"A driver must be permitted to proceed after a routine traffic stop if a license and registration check reveal no reason to detain the driver" further. *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000). However, "an officer can extend the stop if he either has a 'reasonable articulable suspicion of other crimes or the driver voluntarily consents to further questioning.'" *United States v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005) (citation omitted). Therefore, the court next examines whether Officer Bowles had reasonable articulable suspicion of other crimes or if Defendant Macias consented to further questioning.

### 1. Reasonable Articulable Suspicion

Reasonable suspicion exists where there is a "particularized and objective basis for suspecting criminal activity." *United States v. Tucker*, 305 F.3d 1193, 1200 (10th Cir. 2002), *cert. denied*, 537 U.S. 1223 (2003). In evaluating whether an officer had reasonable suspicion, the Tenth Circuit considers the totality of the circumstances, not facts in isolation. *See id.* "A factor may contribute to reasonable suspicion even if it 'is not by itself proof of any illegal conduct and is quite consistent with innocent travel.'" *United States v. Valles*, 292 F.3d 678, 680 (10th Cir.) (citation omitted), *cert. denied*, 537 U.S. 939 (2002).

In this case, Officer Bowles testified of at least eight factors that contributed to his suspicion that Defendants were

engaged in criminal activity.  Those factors are:  (1) Officer
Bowles detected a strong but unidentifiable chemical odor, which
he associated with false compartments, coming from the pickup
(Tr. at 15-16); (2) Defendant Macias was more nervous than the
majority of people Officer Bowles has stopped for traffic
violations, and his nervousness increased rather than decreased
over time (Tr. at 24); (3) Defendant Fodness acted nervous, which
was partially exhibited by her avoiding looking at Officer Bowles
(Tr. at 24); (4) Defendant Macias said that he and Defendant
Fodness had been dating for six months and that they had spent
the last week together on a vacation, but he did not know her
last name (Tr. at 25); (5) Defendant Macias said he worked at a
restaurant and did construction work, but when asked for whom he
worked, he then said he did not have a job (Tr. at 28); (6) both
defendants said they were unemployed, but were on a week-long
vacation to visit family (Tr. at 26-29); (7) despite the claimed
week-long vacation, Defendants had only two small gym bags for
luggage between the two of them (Tr. at 15); and (8) Defendants
were traveling on a known drug corridor, coming from a drug
source state (Tr. at 35-36).  The court concludes that taken
together, these factors provided Officer Bowles with objectively
reasonable suspicion of criminal activity.

     Defendants provide possible innocent explanations for almost
every factor.  However, as explained above, the court does not
consider whether each individual factor could have an innocent

explanation, but whether a reasonable officer, when presented with the totality of the circumstances, would suspect criminal activity. *See Valles*, 292 F.3d at 680.

Officer Bowles had observed each of these factors before asking Defendant Macias if he could ask him more questions. Therefore, the court concludes that because Officer Bowles had reasonable articulable suspicion of criminal activity before continuing the stop, he did not unreasonably exceed the scope of the stop.

### 2.  Defendant Macias' Consent To Be Asked More Questions

In addition, after examining the record, the court also concludes that Officer Bowles legitimately extended the stop because Defendant Macias, the driver of the pickup, consented to further questioning.

"'A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer.'" *West*, 219 F.3d at 1176 (citation omitted).  "A detention for a traffic citation can turn into a consensual encounter after the trooper has returned the driver his documentation so long as 'a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information.'" *Wallace*, 429 F.3d at 974-75 (quoting *United States v. Elliott*, 107 F.3d 810, 814 (10th Cir. 1997)).

In this case, Officer Bowles returned Defendant Macias'
documents, issued him a warning for the violation, told him he
was free to go, and turned off the patrol car's front-facing
lights.  (Tr. at 29.)  Defendant Macias confirmed that he was
free to go, exited the patrol vehicle, and headed back to his own
truck.  (Tr. at 30.)  When Defendant Macias reached his own
vehicle, Officer Bowles got out of his patrol car and asked
Defendant Macias if he would answer more questions.  (Tr. at 30.)
Officer Bowles testified that he asked Defendant Macias, "Sir,
can I ask you some more questions?"  (Tr. at 63.)  Officer Bowles
also testified that he "didn't do anything to motion [Defendant
Macias] back."  (Tr. at 63.)  At that point, when Defendant
Macias agreed to have Officer Bowles ask him more questions,
Defendant Macias was near his pickup with his documents in hand
after confirming he was free to leave.  The court concludes that
under such circumstances, a reasonable person would feel free to
leave and disregard Officer Bowles's request for more
information.

Officer Bowles testified that in his mind, Defendants
actually were not free to leave.  (Tr. at 62.)  However, Officer
Bowles's subjective intent is not the issue in this case.  The
issue is whether a reasonable person in Defendant Macias's
situation would have felt free to leave and disregard Officer
Bowles's request.

Defendants argue that "it is likely" that Officer Bowles "used a commanding tone of voice" when he asked Defendant Macias about answering more questions because Officer Bowles had no subjective intent to let Defendants leave.  (Document #39, at 11.)  However, such an argument relies on sheer speculation and not on evidence presented to the court.  Officer Bowles did not testify that he used a commanding tone, and nothing in the record supports such an argument.  As a result, the court concludes that Defendant Macias consented to answering more of Officer Bowles' questions after Defendant Macias was told he was free to leave.

Thus, the court concludes that Officer Bowles lawfully prolonged the stop to ask Defendants more questions because Officer Bowles had reasonable articulable suspicion that Defendants were engaged in criminal activity and because Defendant Macias consented to a prolonged encounter.

### C.  Consent to Search the Pickup

Third, Defendants argue Officer Bowles searched the pickup without obtaining a valid consent from Defendants.

"[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  Therefore, "[a]n officer may conduct a warrantless search of a vehicle without violating the Fourth Amendment if the person in control of the vehicle voluntarily consents to the search." *United States v. Taverna*,

348 F.3d 873, 878 (10th Cir. 2003).  "Whether a defendant freely and voluntarily consents to a search is a question of fact determined from the totality of the circumstances."  *United States v. Pena-Sarabia*, 297 F.3d 983, 986 (10th Cir. 2002).  The Government has the burden to prove a valid consent was given to a warrantless search.  *United States v. Cody*, 7 F.3d 1523, 1526 (10th Cir. 1993).

The Government must meet a two-part test to show that consent was given.  First, the Government must "present 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.'  Second, the government must show that the police did not coerce the defendant into granting his consent."  *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998) (internal citation omitted), *cert. denied*, 525 U.S. 903 (1998); *see also United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001).

Turning to the facts of this case, Officer Bowles testified that he asked Defendant Macias, "Can I search the vehicle?" and that Defendant Macias replied, "Okay."  (Tr. at 36-37.)  Officer Bowles then asked Defendant Fodness the same question.  Defendant Fodness replied that she did not see any reason for Officer Bowles to search, but that it was also okay with her for him to search.  (Tr. at 37-38.)  When the court asked Officer Bowles what his best recollection was of Defendant Fodness's response, Officer Bowles testified that she said, "Go ahead."  (Tr. at 38.)

Thus, Officer Bowles's testimony supports that both Defendant Macias and Defendant Fodness consented to a search of the pickup.

Defendants have not offered any contradictory evidence regarding Defendants' consent to the search of the pickup. In addition, none of the other evidence presented to the court contradicts Officer Bowles' testimony that each defendant consented to the search of the pickup. Defendants challenge Officer Bowles's testimony that Defendants consented to the search before the search was conducted, and Defendants note that their alleged consent was not recorded. However, Defendants have not presented any testimony to the court that either contradicts Officer Bowles's testimony or that gives the court reason to question Officer Bowles's credibility.

As a result, the court finds that both Defendant Macias and Defendant Fodness consented to the search of the pickup before the search was conducted, that each Defendant consented in a way that was unequivocal, specific, and freely and intelligently given. Furthermore, the court specifically finds that no evidence has been presented showing that Officer Bowles coerced Defendants into consenting to the search. Therefore, the court rejects Defendants' argument that Officer Bowles searched the pickup without obtaining a valid consent from Defendants.

### D.   The Scope of the Search

Fourth, Defendants argue that even if they consented to a search of the pickup, Officer Bowles's search exceeded the scope of the consent that was given.

"'The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect?'" *United States v. Sanders*, 424 F.3d 768, 774 (8th Cir. 2005) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).  The court looks at the totality of the circumstances in determining whether a search was within the scope of the consent.  *See United States v. Gigley*, 213 F.3d 509, 514 (10th Cir. 2000) (citing *United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1231 (10th Cir. 1998)).  "General permission to search a vehicle usually extends to its entirety, absent objection or limitation by the driver.  However, a search can be so invasive or destructive as to exceed the bounds of consent, even absent objection."  *United States v. Gregoire*, 425 F.3d 872, 880 (10th Cir. 2005) (internal citation omitted).  The Tenth Circuit has "upheld [. . . ] searches involving the partial dismantling of a vehicle pursuant to general consent when the defendant did not object," similar to what occurred in this case.  *Id.* at 880-81 (citing *United States v. Marquez*, 337 F.3d 1203, 1206, 1208-09 (10th Cir. 2003) (prying

24

nailed-down plywood covering from RV bench); *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) (lifting of trunk carpet held by fastener); *United States v. Santurio*, 29 F.3d 550, 553 (10th Cir. 1990) (removing screws which held down carpet); *United States v. Espinosa*, 782 F.2d 888, 892 (10th Cir. 1986) (lifting up loose part of quarter panel)).

In this case, Officer Bowles removed the molding holding down the carpet and then pulled up the carpet "just a little ways" with his bare hands.  (Tr. at 44.)  Then, after confirming the gap with a finger test and attempting to unscrew the plate, Officer Bowles pried open the compartment underneath the carpet with a crowbar just far enough to peek inside.  (Tr. at 47.)

Having reviewed Officer Bowles's testimony, *Gregoire*, and the line of cases cited in *Gregoire*, the court concludes that Officer Bowles's actions were similar to the actions taken by officers in the line of cases cited by the Tenth Circuit in *Gregoire*.  In each of those cases, the Tenth Circuit concluded that the officer's actions did not exceed the scope of the defendant's general consent.  As a result, the court concludes Officer Bowles's actions did not exceed the general consent given by Defendants to search the pickup, and the court rejects Defendants' argument.

## II.  Evidence Obtained From Search of Residence

Defendant Fodness has also filed a motion to suppress the evidence obtained from the search of the 324 South Chicago, Sioux

Falls residence in South Dakota.  Defendant Fodness argues that
the evidence obtained from the search should be suppressed
because the search warrant lacked probable cause such that no
reasonable officer would have relied on it.  To address Defendant
Fodness's argument, the court examines (1) whether the affidavit
established probable cause for the search warrant and (2)
whether, even if the affidavit did not establish probable cause,
the *Leon* good faith exception applies in this case.

### A.  Whether the Affidavit Established Probable Cause for the Search Warrant

The court first examines whether the affidavit established
probable cause for the search warrant.  "An affidavit establishes
probable cause for a search warrant if the totality of the
information it contains establishes the 'fair probability that
contraband or evidence of a crime will be found in a particular
place.'"  *United States v. Soderstrand*, 412 F.3d 1146, 1152 (10th
Cir. 2005) (quoting *United States v. Rice*, 358 F.3d 1268, 1274
(10th Cir. 2004)), *cert. denied*, 126 S. Ct. 1478 (2006).  A
reviewing court should grant great deference to the issuing
magistrate's decision in determining probable cause.  *See
Soderstrand*, 412 F.3d at 1152; *United States v. Leon*, 468 U.S.
897, 914 (1994) ("Reasonable minds frequently may differ on the
question whether a particular affidavit establishes probable
cause, . . . the preference for warrants is most appropriately
effectuated by according 'great deference' to a magistrate's

26

determination.").  In reviewing a search warrant to determine if probable cause exists, the Tenth Circuit asks only "whether the issuing magistrate had a 'substantial basis' for determining probable cause existed." *United States v. Wittgenstein*, 163 F.3d 1164, 1172 (10th Cir. 1998) (quoting *Lawmaster v. Ward*, 125 F.3d 1341, 1348 (10th Cir. 1997)), *cert. denied*, 527 U.S. 1012.

Turning to the instant case, the court finds that at least five facts were set forth in the affidavit that, together, provided probable cause for issuing the search warrant.  First, the warrant establishes through multiple witnesses, including one who lives upstairs in the same building, that Defendant Fodness lived at the address with her boyfriend.  *See* Affidavit, ¶¶ 2, 5, 6-9.  Second, the affiant explained that he had personally been involved in investigations of Defendant Fodness's narcotics activities since 1997, and in 2005, an associate of Defendant Fodness was arrested for possession of methamphetamine while driving a vehicle registered to Defendant Fodness.  (Affidavit ¶¶ 3, 4.)  Third, a defendant in an unrelated methamphetamine case, who was therefore a known informant,[7] told investigators that Defendant Fodness had been his source for methamphetamine recently and on an ongoing basis, since September 2005, and that

---

[7]Defendant Fodness erroneously refers to the informant as a confidential informant and argues that the rules applicable to confidential informants should apply in this case.  On the contrary, the informant was known and listed by name on the affidavit.

she had dealt him methamphetamine at the 324 South Chicago address.  (Affidavit ¶ 7.)  Fourth, Defendant Fodness's current boyfriend, who also lived at the 324 South Chicago residence, had recently been arrested for shoplifting syringes and his urine tested positive for the presence of methamphetamine.  (Affidavit ¶ 7.)  Fifth, the affidavit also mentions the February 2, 2006 arrest of Defendant Fodness, discussed above, in which Defendant Fodness was a passenger in a pickup transporting six pounds of methamphetamine, traveling east through Utah.  (Affidavit ¶ 1.)

The court concludes that, taken together, the above information set forth in the affidavit established probable cause which supported the issuance of the search warrant.  The known informant, who told authorities he had purchased methamphetamine from Defendant Fodness at the 324 South Chicago address, well established the probability that evidence or contraband would be found at the South Chicago residence.  The informant's information is supported by the fact that his statement is against his own penal interest and he is asserting first-hand knowledge of the information.  The informant's information appears to be supported by the instant arrest of Defendant Fodness, which lends credence to the allegation that Defendant Fodness has been involved in recent distribution of methamphetamine, and by the presence of methamphetamine in her current boyfriend's (and co-resident's) urine.  Contrary to Defendant Fodness's argument, the informant's information

28

provides a connection between the target location and the other
facts set forth in the affidavit.  Indeed, it establishes
probable cause that contraband or evidence of a crime would be
found at the South Chicago residence.

Defendant Fodness relies on two cases to support her
argument that the information in the affidavit did not support a
finding of probable cause.  The two cases are *United States v.
Tuter*, 240 F.3d 1292 (10th Cir.), *cert. denied*, 534 U.S. 886
(2001), and *United States v. Danhauer*, 229 F.3d 1002 (10th Cir.
2000).  The court has carefully reviewed each of these cases and
concludes that the facts in this case differ enough from the
facts in *Tuter* and *Danhauer* that the reasoning in those cases
does not apply to this case.  Both *Tuter* and *Danhauer* involve
confidential informants, while this case involves a known
informant who made statements based on first-hand experience and
that were against his penal interest.  In neither *Tuter* nor
*Danhauer* does it appear there was information in the affidavit to
indicate the confidential informant's knowledge basis; however,
in this case, the informant, who is known, asserted personal,
first-hand knowledge as a participant in the illegal conduct at
the targeted location.  *See Illinois v. Gates*, 462 U.S. 213, 230
(1983) (explaining that an informant's "basis of knowledge" is
one way in which information from an informant can be validated).

In conclusion, the court concludes that the magistrate who
issued the search warrant of the South Chicago residence "had a

'substantial basis' for determining probable cause existed."  *See*
*Wittgenstein*, 163 F.3d at 1172 (quoting *Lawmaster v. Ward*, 125
F.3d 1341, 1348 (10th Cir. 1997)).

####    B.   Application of the *Leon* Good-Faith Exception

Second, the court examines whether, even if the warrant did
not contain sufficient probable cause, the *Leon* good-faith
exception would apply in this case.  *See United States v. Leon*,
468 U.S. 897, 925 (1984).

*Leon* created a presumption that when an officer relies upon
a warrant, the officer is acting in good faith.  *See Leon*, 468
U.S. at 921; *see also United States v. Cardall*, 773 F.2d 1128,
1133 (10th Cir. 1985).  The Court in *Leon* explained, "In the
ordinary case, an officer cannot be expected to question the
magistrate's probable-cause determination. . . . '[O]nce the
warrant issues, there is literally nothing more the policeman can
do in seeking to comply with the law.'  Penalizing the officer
for the magistrate's error, rather than his own, cannot logically
contribute to the deterrence of Fourth Amendment violations."
*Leon*, 468 U.S. at 921 (internal citation omitted).  The Tenth
Circuit has explained that "[w]hen we consider whether the
officer relied in good faith upon a warrant, we must look to the
underlying documents to see whether they are *devoid* of factual
support, not merely whether the facts they contain are legally
sufficient. . . . Courts cannot make the good faith of an officer

turn on whether his reliance on a warrant was misplaced.  It is
only when the reliance was wholly unwarranted that good faith is
absent." *See Cardall*, 773 F.2d at 1133 (emphasis in original).

There are four situations in which an officer would not have
reasonable grounds for believing a warrant was properly issued,
so the good faith exception to the exclusionary rule would not
apply in those four situations.  First, evidence should be
suppressed if the issuing magistrate was misled by an affidavit
containing false information or information that the affiant
would have known was false if not for his "reckless disregard of
the truth." *Id.* at 923.  Second, the exception does not apply
when the "issuing magistrate wholly abandoned his judicial role."
*Id.*  Third, the exception does not apply when the affidavit in
support of the warrant is "'so lacking in indicia of probable
cause as to render official belief in its existence entirely
unreasonable.'" *Id.* (citation omitted).  Fourth, the exception
does not apply when a warrant is so facially deficient that the
executing officer could not reasonably believe it was valid.  *See
id.*  It appears Defendant Fodness is arguing that the third
situation applies in this case.

The court disagrees.  Defendant Fodness has not presented
information that leads this court to conclude that the warrant in
this case is devoid of factual support or that the officers'
reliance upon the warrant was wholly unwarranted.  On the
contrary, the court's review of the facts contained in the

31

affidavit provide sufficient factual support for an officer's good faith reliance.  As set forth in detail above, the court concludes that the affidavit establishes sufficient information to provide probable cause for the search warrant.

Based on the court's review of the warrant and supporting affidavit, the court concludes that even were the court to conclude that probable cause did not exist, the *Leon* good faith exception applies.  *See Tuter*, 240 F.3d at 1300 (concluding that even though probable cause did not exist, the warrant was not so facially insufficient that the officer should have known the search was illegal despite the magistrate's authorization); *Danhauer*, 229 F.3d at 1007 (concluding that even though probable cause did not exist, the affidavit supporting the warrant was not so lacking in indicia of probable cause that the executing officer should have known the search was illegal despite the magistrate's authorization).

## RECOMMENDATION

Based on the foregoing analysis, **IT IS HEREBY RECOMMENDED** that Defendants' Motions to Suppress (Documents #25, 29) be **DENIED**.

Copies of the foregoing report and recommendation are being mailed to the parties who are hereby notified of their right to object to the same.  The parties are further notified that they must file any objections to the report and recommendation, with

the clerk of the district court, pursuant to 28 U.S.C. § 636(b),

within ten (10) days after receiving it.  Failure to file

objections to both factual and legal findings may constitute a

waiver of those objections on subsequent appellate review.

DATED this ___13___ day of November, 2006.

BY THE COURT:

Samuel Alba
United States Chief Magistrate Judge